**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

Chancely FANFAN, María MALDONADO CRUZ, and Elesban ANGEL MENDEZ,

Petitioners-Plaintiffs,

v.

Markwayne MULLIN, Secretary of Homeland Security; Christopher J. LAROSE, Warden, Otay Mesa Detention Center; Daniel A BRIGHTMAN, Field Office Director, San Diego Field Office, United States Immigration and Customs Enforcement; Todd M. LYONS, Acting Director, United States Immigration and Customs Enforcement; Todd BLANCHE, Acting Attorney General, in their official capacities,

Defendants.

Case No.: 25-cv-3291-DMS-BJW

**ORDER GRANTING PLAINTIFFS' MOTION TO STAY EFFECTIVE DATE OF AGENCY ACTION**

**[ECF No. 18]**

Pending before the Court is Plaintiffs' motion to stay effective date of agency action. For the reasons stated below, the Court grants Plaintiffs' motion.

## I.

## BACKGROUND

The factual and procedural background of this case has been set out in the Court's prior orders, and the Court incorporates those facts here. (ECF Nos. 13, 37, 47.) The Court recently granted Plaintiffs' motion for provisional class certification, provisionally certifying a class with the following definition:

> Noncitizens with pending 8 U.S.C. § 1229a removal proceedings who have been or will be re-detained in the Southern District of California while appearing at an ICE "check-in" or appointment; who are not subject to detention under 8 U.S.C. § 1226(c); who DHS previously released from custody; and for whom ICE has not conducted a pre-deprivation hearing to determine whether material changes in circumstances justify re-detention.

(ECF No. 47 at 26.)

Plaintiffs now move for a classwide order under the Administrative Procedure Act (APA), 5 U.S.C. § 705, postponing the effective date of the alleged Re-Detention Policy pending conclusion of this litigation. ("Pls.' Mot.", ECF No. 18.) Defendants filed an opposition. ("Defs.' Opp'n", ECF No. 25.) Plaintiffs filed a reply. ("Pls.' Reply", ECF No. 26.)

## II.

## LEGAL STANDARD

Section 705 of the APA provides that, "[o]n such conditions as may be required and to the extent necessary to prevent irreparable injury, the reviewing court . . . may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." "The postponement of agency action under the APA is governed by the preliminary injunction factors." *E.g.*, *Nat'l TPS All. v. Noem*, 150 F.4th 1000, 1015 (9th Cir. 2025); *see also Ohio v. EPA*, 603 U.S. 279, 291 (2024) (applying traditional stay factors to request for interim stay of enforcement of federal regulation). A party seeking such relief must establish (1) that he is likely to succeed on the merits, (2) that he is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in his favor, and (4)

that an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) (citations omitted).

Preliminary relief is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief," *id.* at 22, and "the party requesting a stay bears the burden of showing that the circumstances justify an exercise of [the court's] discretion." *Nken v. Holder*, 556 U.S. 418, 433–34 (2009). The first two factors "are the most critical"; a movant must show "more than a mere possibility" of success and irreparable injury. *See id.* at 434–35 (citation modified). In the Ninth Circuit, courts may evaluate the factors on a sliding scale, such that "a stronger showing of one element may offset a weaker showing of another," and "serious questions going to the merits and a balance of hardships that tips sharply towards the plaintiff can support issuance of [an interim stay], so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *See, e.g.*, *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131, 1135 (9th Cir. 2011) (citation modified). Where, as here, the Government is the opposing party, the final two factors (the balance of equities and public interest) merge. *Nken*, 556 U.S. at 435.

Interim relief under § 705 is available only "to the extent necessary to prevent irreparable injury," 5 U.S.C. § 705, and "must be narrowly tailored to remedy the specific harm shown." *Nat'l TPS All.*, 150 F.4th at 1027 (quoting *E. Bay Sanctuary Covenant v. Barr*, 934 F.3d 1026, 1029 (9th Cir. 2019)). Although the Supreme Court has held that universal injunctions likely exceed federal courts' equitable authority, *Trump v. CASA, Inc.*, 606 U.S. 831 (2025), it expressly reserved "the distinct question whether the Administrative Procedure Act authorizes federal courts to vacate federal agency action." *Id.* at 847 n.10. The Ninth Circuit has since held that *CASA* "does not narrow the scope of the injunctive relief possible under the APA." *Novedades Y Servicios, Inc. v. Fin. Crimes Enf't Network*, 181 F.4th 961, 982 (9th Cir. 2026) (citation omitted). "Indeed, the U.S. Supreme Court itself has granted universal stays of agency actions pending final merits review." *Id.* (citations omitted). However, *CASA*'s complete-relief principle may provide

"some useful guidance for crafting interim equitable relief" under § 705. *See Immigrant Defs. L. Ctr. v. Noem*, 145 F.4th 972, 995 (9th Cir. 2025), *overruled on other grounds by Arizona All. for Retired Americans v. Mayes*, 186 F.4th 622 (9th Cir. 2026) (en banc).

**III.**

**ANALYSIS[1]**

Plaintiffs argue that they are entitled to an interim stay because Defendants' Re-Detention Policy is arbitrary and capricious in violation of 5 U.S.C. § 706(2)(A) and contrary to constitutional right in violation of § 706(2)(B). The Court agrees.

**A. Plaintiffs are likely to succeed on the merits.**

**1. Defendants' Re-Detention Policy is reviewable under the APA.**

To be reviewable under the APA, Defendants' Re-Detention Policy must constitute "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. Defendants' policy is unreviewable if it is "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). "In general, there is a strong presumption that Congress intends judicial review of administrative action." *Garro Pinchi v. Noem*, 813 F. Supp. 3d 973, 1019 (N.D. Cal. 2025) (quoting *Pinnacle Armor, Inc. v. United States*, 648 F.3d 708, 718 (9th Cir. 2011)). This presumption can only be overcome "if there is clear and convincing evidence that Congress intended to preclude judicial review." *Id.* at 1025 (quoting *Washington v. U.S. Dep't of State*, 996 F.3d 552, 560 (9th Cir. 2021)). "Agency action" includes "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. 551(13). This "broad[]" definition "is meant to cover comprehensively every manner in which an agency may exercise its power." *San Francisco Herring Ass'n v. Dep't of the Interior*, 946 F.3d 564, 575–576 (9th

[1] The Government reiterates several threshold arguments (justiciability and statutory jurisdictional bars) the Court has already rejected several times. (*See* Defs.' Opp'n 5–9; Order Denying Defs.' Mot. Dismiss 6–16; Order Granting in Part & Den. in Part Pls.' Mot. Provisional Class Certification 7 n.1.) The Court stands on its previous decisions rejecting these arguments.

Cir. 2019) (quoting *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 478 (2001)). Defendants' Re-Detention Policy is reviewable here.

**a. Defendants' Re-Detention Policy constitutes final agency action.**

Agency action is final where (1) it marks "the consummation of the agency's decisionmaking process," rather than being "of a merely tentative or interlocutory nature"; and (2) the action is "one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (citation omitted). The Supreme Court has instructed lower courts to interpret finality pragmatically. *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 184 (D.D.C. 2015) (quoting *FTC v. Standard Oil Co. of Cal.*, 449 U.S. 232, 239 (1980)). Accordingly, the Ninth Circuit asks "whether the action amounts to a definitive statement of the agency's position or has a direct and immediate effect on the day-to-day operations of the subject party," focusing on "the practical and legal effects of the agency action." *Or. Nat. Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977, 982 (9th Cir. 2006) (citation modified).

Agency action "need not be in writing to be final and judicially reviewable." *Al Otro Lado, Inc. v. McAleenan*, 394 F. Supp. 3d 1168, 1206 (S.D. Cal. 2019) (citation omitted); *see also Kidd v. Mayorkas*, No. 2:20-CV03512-ODW (JPRX), 2021 WL 1612087, at *8 (C.D. Cal. Apr. 26, 2021) (same); *Aracely, R. v. Nielsen*, 319 F. Supp. 3d 110, 138–39 (D.D.C. 2018) (same); *Am. Ass'n of Univ. Professors v. Trump*, 815 F. Supp. 3d 907, 966 (N.D. Cal. 2025) (same). "A contrary rule 'would allow an agency to shield its decisions from judicial review simply by refusing to put those decisions in writing.'" *R.I.L-R*, 80 F. Supp. 3d at 184 (quoting *Grand Canyon Trust v. Pub. Serv. Co. of N.M.*, 283 F.Supp. 2d 1249, 1252 (D.N.M. 2003)). "Nor does the APA's text require that plaintiffs prove the existence of such action through direct rather than circumstantial evidence." *Garro Pinchi v. Noem*, 813 F. Supp. 3d 973, 1022 (N.D. Cal. 2025) (citing *Amadei v. Nielsen*, 348 F. Supp. 3d 145, 166 (E.D.N.Y. 2018)). A defendant agency's behavior is relevant to inferring a policy's existence. *Id.*

Plaintiffs have shown final agency action here. In *Garro Pinchi v. Noem*, the district court granted a motion for an interim stay of DHS's similar re-detention policy in the jurisdiction of the San Francisco ICE Field Office. *See generally* 813 F. Supp. 3d 973. The Court finds *Garro Pinchi* persuasive. Here, as in *Garro Pinchi*, Plaintiffs "offer voluminous evidence that, before . . . 2025, DHS's practice for more than 40 years was to re-detain a noncitizen whom it had previously released only after making an individualized determination that the noncitizen's circumstances had materially changed since their release, such that the noncitizen posed a flight risk or danger to the public." *Id.* at 1019.

In 1981, the BIA held that "where a previous bond determination has been made by an immigration judge, no change should be made by a District Director absent a change of circumstance." *Saravia v. Sessions*, 280 F. Supp. 3d 1168, 1197 (N.D. Cal. 2017) (quoting *Matter of Sugay*, 17 I. & N. Dec. 637, 640 (BIA 1981)). DHS incorporated *Matter of Sugay*'s holding into its practice, stating that it "requir[ed] a showing of changed circumstances both where the prior bond determination was made by an immigration judge and where the previous release decision was made by a DHS officer." *Id.* DHS memorialized this practice in a 1995 memorandum, stating, "When an alien has been released from INS custody under bond, such bond can be revoked by the district director pursuant to 8 C.F.R. § 242.2(e) but only based upon 'a change of circumstances.' As such, INS must be able to justify any revocation decision, future detention or release condition." Joint Appendix at 57, *Demore v. Kim*, 538 U.S. 510 (2003) (No. 01-1491), 2002 WL 34705774 (citation omitted). The Government represented in the Northern District of California that this remained its practice as recently as 2017. *Saravia*, 280 F. Supp. 3d at 1197 ("DHS generally only re-arrests an alien pursuant to § 1226(b) after a material change in circumstances."). DHS also incorporated this rule in the paperwork it provides to released noncitizens. For example, Mrs. Cruz's 2019 Order of Release on Recognizance (RoR order) set forth specific conditions for her release, such as "report[ing] for any hearing or interview as directed by the Department of Homeland Security or the Executive Office for Immigration Review." (*See* Decl. Monika Y. Langarica Supp. Pet'rs' Mot. Ex

Parte TRO Ex. 2, ECF No. 3-5; *id.* Ex. 3 (same for Mr. Mendez).) The RoR Order also provides that ICE officers could only cancel Mrs. Cruz's release given a change in circumstances: specifically, if she "failed to comply with the conditions of release" or "was taken into custody for removal" following the conclusion of removal proceedings. (*See id.*)

Defendants' practice looks different today. In October of 2025, "DHS officers . . . began re-detaining released noncitizens on a large scale without making . . . individualized determinations, as evidenced by the declarations of immigration attorneys . . . and detained noncitizens." *See Garro Pinchi*, 813 F. Supp. 3d at 1020. For example, Luis Gonzalez, Executive Director of Immigration Services for Jewish Family Service (JFS) of San Diego, declared, based on documented calls from individuals in immigration custody:

> [I]t is evident that ICE is carrying out arbitrary detentions during scheduled check-ins at a scale I have not previously seen in my role at JFS or in my over 9 years of immigration law practice in San Diego. Individuals who appear for their appointments as instructed by ICE are being taken into custody without prior notice or a change in their reporting requirements. These community members are complying with ICE's directives, yet their compliance results in unexpected . . . detention.

(ECF No. 17-8 ¶ 6.)

Mr. Gonzalez's observations track judicial and media records of Defendants' Re-Detention Policy. As outlined in the Court's order granting provisional class certification, Defendants have arbitrarily re-detained at least dozens of individuals (and likely far more). (Order Granting in Part & Den. in Part Pls.' Mot. Provisional Class Certification 18–19.) Further, extensive media coverage[2] beginning in October of 2025 documents over a

---

[2] News articles are hearsay when offered for their content. *Larez v. City of Los Angeles*, 946 F.2d 630, 642–43 (9th Cir. 1991). However, the Court has previously considered news articles when weighing requests for preliminary relief. *See Ms. L. v. U.S. Immigr. & Customs Enf't ("ICE")*, 310 F. Supp. 3d 1133, 1145 n.10 (S.D. Cal. 2018). That is because "the rules of evidence do not apply strictly" at the preliminary relief stage. *See Herb Reed Enters., LLC v. Fla. Ent. Mgmt., Inc.*, 736 F.3d 1239, 1250 n.5 (9th Cir. 2013). It is therefore "within the discretion of the district court to accept . . . hearsay for purposes

hundred arbitrary arrests. *See* Kate Morrissey, *ICE in San Diego has a new policy — detain everyone* (Oct. 10, 2025), https://www.daylightsandiego.org/ice-in-san-diego-has-anew-policy-detain-everyone/; Lillian Perlmutter, *Asylum-seekers now held for days – in a downtown San Diego basement* (Oct. 20, 2025), https://timesofsandiego.com/politics/2025/10/20/asylum-seekers-held-basementsan-diego-ice/; Jesus Jimenez, *Emotional Glimpses of an Immigration Crackdown in a San Diego Courthouse* (Nov. 8, 2025), https://www.nytimes.com/card/2025/11/08/us/immigration-ice-san-diegocourthouse; Kate Morrissey, *ICE in San Diego is arresting everyone who shows up for contractor check-in, attorneys say* (Dec. 23, 2025), https://www.daylightsandiego.org/ice-in-san-diego-is-arresting-everyone-whoshows-up-for-contractor-check-in-attorneys-say/.

Mr. Gonzalez's observations also track Plaintiffs' experiences. The ICE agent who arrested Mr. Fanfan told him that the reason for his re-detention was that "the government was requiring" the agent to do it, not that the agent made any individualized "decision." (Decl. Chancely Fanfan Supp. Pet'rs' Mot. Ex Parte TRO ("Fanfan Decl.") ¶ 23, ECF No. 3-1.) ICE gave Mrs. Cruz's lawyer and Mr. Mendez similar reasons. (Decl. Matthew G. Holt Supp. Pet'rs' Mot. Ex Parte TRO ¶ 8, ECF No. 3-4 ("Based on what an ICE officer told me Mrs. Maldonado Cruz was arrested because he (the ICE officer) had been instructed to detain everyone coming in for check-ins that day."); Decl. Elesban Angel Mendez Supp. Pet'rs' Mot. Ex Parte TRO ("Mendez Decl.") ¶ 16, ECF No. 3-3 ("The ICE officer said he was arresting me because under President Trump every person who is here illegally had to be arrested. . . . I hadn't had any problems. The officer said he was sorry, but those were his orders.").) Defendants re-detained the named plaintiffs despite all three having a post-release record of complying with the law, immigration court hearings, and

---

of deciding whether to issue" preliminary relief. *See id.* (quoting *Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1363 (9th Cir. 1988) (en banc)). Defendants neither raise objections to the news reports Plaintiffs cite nor dispute their content. While the Court would reach the same conclusion without these news reports, they provide useful context.

ICE appointments, supporting their accounts of arbitrary re-detention. (Fanfan Decl. ¶ 12; Decl. Maria Maldonado Cruz Supp. Pet'rs' Mot. Ex Parte TRO ("Cruz Decl.") ¶¶ 4, 6–8, 20, ECF No. 3-2; Mendez Decl. ¶¶ 6–8.)

These facts represent a deliberate policy shift, the consummation of Defendants' decisionmaking process, and a definitive statement of their position. "[I]t is beyond belief that DHS officers would abruptly and uniformly depart from decades-long re-detention practices in such a novel way absent DHS's authorization or instruction to do so." *Garro Pinchi*, 813 F. Supp. 3d at 1021. "And . . . both the Acting Director of ICE and attorneys for DHS have stated that DHS believes § 1225(b)(2) authorizes this novel re-detention practice, further suggesting that the change in [Defendants' practice] occurred due to top-down guidance." *Id.* And Defendants' policy change determined Plaintiffs' rights and obligations and carried legal consequences; indeed, it led to Plaintiffs' detention in harsh conditions. Defendants detained Fanfan "in a very small room with about ten other people," where the lights stayed on 24/7. (Fanfan Decl. ¶ 26.) He had only a thin mat shared with several other people to sleep on. (*Id.*) Mrs. Cruz and Mr. Mendez had similar experiences. (Cruz Decl. ¶¶ 23–25; Mendez Decl. ¶¶ 19–20.) As all three complied with their release conditions, it is highly unlikely they would have been re-detained absent Defendants' Re-Detention Policy.[3]

Here, as in *Garro Pinchi*, "[t]he government has offered nothing to rebut plaintiffs' evidence of the sudden and drastic change in DHS officers' re-detention practices. Quite the opposite . . . ." *See* 813 F. Supp. 3d at 1021. As in that case, Defendants argue that "[w]hat Plaintiffs describe as a 'policy' is neither formally promulgated nor concretely applied. At most, the purported 'Re-Detention Policy' is an aggregation of individual enforcement actions and resource judgments . . . ." (*See* Defs.' Opp'n 11.) The Court finds

[3] *See Garro Pinchi*, 813 F. Supp. 3d at 1024. Accordingly, the Court finds that, as in *Garro Pinchi*, Defendants' new Re-Detention Policy "had an immediate effect on DHS's day-to-day operations." *Id.* (citation modified).

it implausible that DHS officers "awoke one morning in [October] and independently decided to start violating their employer's decades-long policy." *See Garro Pinchi*, 813 F. Supp. 3d at 1021. "Were that true, the government could have provided some evidence to that effect, such as declarations from DHS leaders disclaiming the existence of a new policy or from DHS officers attesting to their individual choice to re-detain noncitizens absent changed circumstances." *See id.* Defendants point to no such evidence here.[4] Given the evidence that DHS switched to a blanket Re-Detention Policy around October of 2025 and its failure to provide any contrary evidence supporting its contention that no such change was made, the record supports the Court's factual finding, for purposes of this motion, that around October of 2025, DHS approved a new policy of detaining noncitizens whom it had previously released without conducting individualized determinations regarding material changes in circumstance, and that it later justified the change based on its new interpretation of 8 U.S.C. § 1225(b)(2). *See id.*

Defendants similarly suggest that their new Re-Detention Policy is the result of "a self-executing statutory mandate" imposed by § 1225(b)(2) rather than agency action. (Defs.' Opp'n 1, 11.) This argument misses the mark in two ways. First, Defendants are again erroneously attempting to recast Plaintiffs' challenge into the narrow argument that "Defendants' 'new policy' of re-detaining individuals based on the Government's interpretation that § 1225(b)(2) mandates detention of all non-admitted noncitizens violates the APA." (*See* Defs.' Opp'n Pls.' Mot. Provisional Class Certification 11.) But Plaintiffs' challenge is broader than that; they challenge Defendants' new Re-Detention Policy without regard to the statutory authority Defendants invoke to justify it. *See Garro Pinchi*, 813 F. Supp. 3d at 1023 ("What plaintiffs challenge . . . is DHS's policy of re-detaining

---

[4] *See id.* The Court similarly rejects Defendants' argument that Plaintiffs seek "programmatic oversight" of ICE operations. (*See* Defs.' Opp'n 11.) Plaintiffs permissibly "challenge a specific and discrete agency action—DHS's change in policy authorizing the re-detention of previously released noncitizens without individualized determinations as to any material change in circumstances." *See Garro Pinchi*, 813 F. Supp. 3d at 1023.

noncitizens whom it previously released without first making an individualized determination that their material circumstances have changed. Plaintiffs challenge that policy without regard to the statutory authority DHS invokes to justify it . . . .”).) The class is therefore not limited to those subject to Defendants' interpretation of § 1225(b)(2). (*See* Order Granting in Part & Den. in Part Pls.' Mot. Provisional Class Certification 30.) Second, even if Defendants' interpretation of § 1225(b)(2) were relevant, “the term ‘agency action’ encompasses an agency's interpretation of the law.” *See Garro Pinchi*, 813 F. Supp. 3d at 1022 (citation modified) (rejecting identical argument). Therefore, even if DHS were “merely restating an interpretation of § 1225(b)(2) that already exists in the relevant body of statutes, regulations, and rulings, its novel application and enforcement of that interpretation” would be agency action. *Id.* (citation modified).

**b. Plaintiffs have no other adequate remedy in a court.**

Defendants argue that “Plaintiffs have another remedy available in the form of individual habeas actions or potential claim for damages,” making Defendants' Re-Detention Policy unreviewable under 5 U.S.C. § 704. (*See* Defs.' Opp'n 12.) Not so. First, “Plaintiffs could not use habeas to challenge the process by which DHS determines whether it will re-detain noncitizens.” *Garro Pinchi*, 813 F. Supp. 3d at 1026. “[H]abeas petitioners may challenge only the fact or duration of confinement.” *Id.* Defendants conceded this in their Motion to Dismiss, where they argued that Plaintiffs' challenge to the Re-Detention Policy is not cognizable in habeas. *See id.*; ECF No. 23 at 19–21. Therefore, even if it were true that “Plaintiffs have already received relief on their habeas claims and present no actual risk that they or anyone else for whom a court has required a pre-deprivation hearing as a condition to re-detention will be unlawfully detained in the future,”[5] this fact would

---

[5] (Defs.' Opp'n 12.) Defendants' statement is false—the Court has granted no Plaintiff-Petitioner's habeas petition and has repeatedly emphasized that Plaintiff-Petitioners remain at risk of re-detention. (*See* Order Granting in Part & Den. in Part Pls.' Mot. Provisional Class Certification 27 (citing Order Denying Defs.' Mot. Dismiss 5, 10–11).)

be irrelevant to whether Plaintiffs have another adequate remedy. Similarly, a claim for damages would neither cure the risk of re-detention nor be available. The Supreme Court has not implied a new constitutional cause of action for damages against federal officers since 1980 and instructed that it would be improper to do so "in all but the most unusual circumstances." *Garro Pinchi*, 813 F. Supp. 3d at 1026 (quoting *Goldey v. Fields*, 606 U.S. 942, 942–43 (2025) (per curiam)). For Plaintiffs to obtain damages under a new *Bivens* cause of action would therefore be "plainly disfavored, if not insurmountable." *Id.* (citation omitted). Therefore, the Court "concludes that there is no risk that a legal remedy under the APA would impermissibly provide for duplicative review." *Id.* (citation modified) (quoting *Hyatt v. Off. of Mgmt. & Budget*, 908 F.3d 1165, 1173 (9th Cir. 2018)).

**c. Defendants' Re-Detention Policy is not committed to agency discretion by law.**

Defendants argue that "the enforcement decisions Plaintiffs challenge are committed to agency discretion by law and the INA provides no 'meaningful standard' by which a court can second-guess the agency's timing or prioritization of detentions under § 1225(b)(2)." (Defs.' Opp'n 11.) Courts read Section 701(a)(2)'s exception for action committed to agency discretion "quite narrowly." *Garro Pinchi*, 813 F. Supp. 3d at 1025 (citation modified) (quoting *Johnson v. United States*, 145 F.4th 1158, 1163 (9th Cir. 2025)). As the district court set forth in rejecting an identical Government argument in *Garro Pinchi v. Noem*,

> Agency action is 'committed to agency discretion' only in those rare circumstances where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion. In other words, judicial review is unavailable when there is no law to apply. And the Supreme Court generally limits the exception to certain categories of administrative decisions that courts traditionally have regarded as committed to agency discretion.

*Id.* (citation modified).

"This is not the rare circumstance where there is no law to apply." *Id.* (citation modified). Instead, DHS's longstanding prior practice, under which it required a showing

of changed circumstances before re-detention, itself "provides a benchmark"—or "law to apply"—in determining whether Defendants' new policy is arbitrary and capricious. *See id.* (citation modified). Nor have Defendants established that immigration enforcement decisions fall within the categories of administrative decisions that courts traditionally have regarded as committed to agency discretion. *See id.* (citation omitted). "To the contrary, the Ninth Circuit has held that there are meaningful standards of review and ha[s] declined to apply § 701(a)(2) in several immigration cases." *Id.* (citation modified) (quoting *Perez Perez v. Wolf*, 943 F.3d 853, 861 (9th Cir. 2019)). Therefore, § 701(a)(2) does not bar judicial review here. *See id.*

**2. Defendants' Re-Detention Policy is likely arbitrary and capricious.**

Section 706(2)(A) of the APA authorizes courts to "set aside" agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "The touchstone of arbitrary and capricious review under the APA is reasoned decisionmaking." *All. for the Wild Rockies v. Petrick*, 68 F.4th 475, 493 (9th Cir. 2023) (citation modified). Agencies must "support and explain their conclusions with evidence and reasoned analysis." *Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 623 F.3d 633, 648 (9th Cir. 2010) (citation omitted). If "the agency has . . . entirely failed to consider an important aspect of the problem," its decisionmaking is insufficiently reasoned. *Petrick*, 68 F.4th at 492 (quoting *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). Courts may not consider post hoc agency rationalizations. *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 21 (2020).

When, as here, an agency changes its existing policy, it must at least "display awareness" that it is changing position and show that there are good reasons for the new policy. *See Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016) (citation omitted). In explaining its changed position, an agency must also be aware that longstanding policies may have "engendered serious reliance interests that must be taken into account." *Id.* at 222. The agency must therefore provide a reasoned explanation "for

disregarding facts and circumstances that underlay or were engendered by the prior policy." *Id.* "An unexplained inconsistency in agency policy is a reason for holding an interpretation to be an arbitrary and capricious change from agency practice." *Id.* (citation modified). Here, as in *Garro Pinchi*, DHS failed to articulate *any* explanation for its change in policy; instead, it maintains that its new Re-Detention Policy does not exist. *See* 813 F. Supp. 3d at 1026–28. That argument fails for the reasons discussed above. Therefore, DHS's new policy is likely arbitrary and capricious, as it has not "display[ed] awareness" that it is changing position, *see Encino Motorcars*, 579 U.S. at 221, let alone offered a reasoned explanation for doing so. *See Garro Pinchi*, 813 F. Supp. 3d at 1026–28.

Defendants' new Re-Detention Policy is also likely arbitrary and capricious because they failed to consider the "serious reliance interests" engendered by their earlier policy. *See id.* at 1033. For example, Defendants issued Mrs. Cruz and Mr. Mendez paperwork setting forth only two conditions for canceling their release: if they failed to comply with their conditions of release or were taken into custody following the conclusion of their removal proceedings. (*See* Decl. Monika Y. Langarica Supp. Pet'rs' Mot. Ex Parte TRO Ex. 2–3.) Plaintiffs accordingly reasonably expected "that they would retain their physical liberty unless they violated the conditions of their release or their material circumstances otherwise changed." *See Garro Pinchi*, 813 F. Supp. 3d at 1033; Fanfan Decl. ¶ 23 ("When the agent told me he was going to keep me detained, I was in disbelief. . . . I told him . . . that I had never done anything wrong . . . but none of that seemed to matter to him."); Cruz Decl. ¶¶ 19–20 (expressing Mrs. Cruz's belief that ICE would not re-detain her because she was following instructions and had never committed a crime or had issues in her immigration case); Mendez Decl. ¶ 16 (expressing same because Mr. Mendez had not had any problems following initial release from immigration detention). Plaintiffs built their lives around this expectation by, among other things, securing employment;[6] entering into

[6] (Fanfan Decl. ¶ 15; Cruz Decl. ¶ 9; Mendez Decl. ¶ 12.)

leases;[7] purchasing cars;[8] investing in their education;[9] getting involved in religious communities[10] and romantic relationships;[11] volunteering;[12] and working to start, grow, and financially support families[13]—"all based on the expectations of continued liberty that DHS engendered." *See Garro Pinchi*, 813 F. Supp. 3d at 1034. The consequences of Defendants' Re-Detention Policy thus "radiate outward" to noncitizens' families, including their children; to the schools where they study and teach; and to the employers who have invested time and money in training them. *See id.* (citation omitted). Defendants were obligated to at least consider these "noteworthy concerns," even if they ultimately determined that Plaintiffs' reliance "was unjustified or entitled to no or diminished weight." *See id.* (citation modified) (quoting *Regents of the Univ. of Cal.*, 591 U.S. at 31–32). "The government does not argue that DHS ever considered these reliance interests. This, too, likely renders the re-detention policy arbitrary and capricious." *See id.*

Defendants' contrary arguments fall short. Defendants argue that because they failed to provide "a record disclosing the grounds upon which the agency acted," the Court has "no foothold for APA review." (Defs.' Opp'n 12–13.) Defendants' argument would allow agencies to insulate policy changes from APA review by simply changing policy silently. The Supreme Court has held otherwise. "[A]n agency changing its course . . . is obligated to supply a reasoned analysis for the change," *State Farm*, 463 U.S. at 42, and "may not . . . depart from a prior policy sub silentio." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). An agency offering no "good reasons" for its new policy does not shield that policy from judicial review; it makes the policy arbitrary and capricious. *Encino Motorcars*, 579 U.S. at 222–24 (quoting *Fox Television Stations*, 556 U.S. at 515).

---

[7] (Fanfan Decl. ¶ 8; Cruz Decl. ¶ 31.)
[8] (Mendez Decl. ¶ 22.)
[9] (Fanfan Decl. ¶ 16.)
[10] (Fanfan Decl. ¶¶ 12–14; Cruz Decl. ¶ 9; Mendez Decl. ¶ 10.)
[11] (Fanfan Decl. ¶ 4; Cruz Decl. ¶¶ 10–11.)
[12] (Fanfan Decl. ¶ 14.)
[13] (Fanfan Decl. ¶¶ 9, 12, 15; Cruz Decl. ¶¶ 9–13, 15, 30–31; Mendez Decl. ¶¶ 9, 12, 21–23.)

Defendants next argue that "§ 1225(b)(2)(A) provides a lawful basis for detention of non-admitted aliens." (Defs.' Opp'n 20.) Defendants submitted their brief before the Ninth Circuit's recent decision in *Rodriguez Vazquez v. Bostock* rejected their argument. *See* 183 F.4th 1160 (2026). Further, even if Defendants' interpretation of § 1225(b)(2) were correct, it would likely be an impermissible post-hoc justification. *See Garro Pinchi*, 813 F. Supp. 3d at 1028–29.

**3. Defendants' Re-Detention Policy is likely contrary to constitutional right.**

Section 706(2)(B) of the APA authorizes courts to "set aside" agency action that is "contrary to constitutional right." 5 U.S.C. § 706(2)(B). As the Court previously held in granting Plaintiffs' TRO motion, Defendants' Re-Detention Policy likely violates Plaintiffs' Procedural Due Process rights.[14] The Fifth Amendment's Due Process Clause provides that no person shall "be deprived of . . . liberty . . . without due process of law." U.S. Const. amend V. This protection applies to noncitizens. *Zadvydas v Davis*, 533 U.S. 678, 690 (2001). Accordingly, "the government's discretion to incarcerate non-citizens is always constrained by the requirements of due process." *Hernandez v. Sessions*, 872 F.3d 976, 981 (9th Cir. 2017). Courts evaluate procedural due process violations using the three-part balancing test of *Mathews v. Eldridge*. 424 U.S. 319, 335 (1976). Under *Mathews*, courts must consider (1) the private interest that the official action will affect; (2) the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and (3) the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. *Id.*

On the first factor, Plaintiffs argue that Defendants' Re-Detention Policy implicates their right to be free from government imprisonment. In *Zadvydas v. Davis*, the Supreme

---

[14] *See also Garro Pinchi*, 813 F. Supp. 3d at 1034–36. Defendants raise no new arguments supporting their contention that their new Re-Detention Policy comports with Procedural Due Process. Instead, they rehash arguments from their motion to dismiss. The Court again rejects these.

Court stated "[f]reedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that [the Due Process] Clause protects." 533 U.S. at 690. Further, "[e]ven when the government has discretion to detain an individual, its subsequent decision to release the individual creates 'an implicit promise' that she will be re-detained only if she violates the conditions of her release." *Pablo Sequen v. Albarran*, 806 F. Supp. 3d 1069, 1082 (N.D. Cal. 2025) (quoting *Morrissey v. Brewer*, 408 U.S. 471, 482 (1972)). "Conditional release is valuable and must be seen as within the protection of the Due Process Clause." *Id.* (citation modified). District courts in the Ninth Circuit "consistently hold that if DHS has released a noncitizen pending civil removal proceedings, the noncitizen has a protected liberty interest in remaining out of immigration custody." *Id.* The Court agrees. This factor weighs in Plaintiffs' favor.

On the second factor, Plaintiffs contend there is a high risk of erroneous deprivation of this liberty interest when noncitizens are re-detained without a custody or bond hearing. They also argue that requiring the Government to conduct a hearing before subjecting noncitizens to re-detention would guard significantly against that risk. Several district courts in California agree with Plaintiffs, *see, e.g., id.* at *1089–90 (citing cases), as does this Court. Therefore, this factor weighs in Plaintiffs' favor.

On the third factor, Plaintiffs assert there is no countervailing government interest justifying their re-detention where they present no flight risk or danger to the community. "The government may have 'a strong interest' in detaining noncitizens during the pendency of removal proceedings as needed to 'protect[] the public from dangerous criminal aliens,' or to prevent flight and thereby 'increase the chance that . . . the aliens will be successfully removed.'" *Pablo Sequen v. Kaiser*, 800 F. Supp. 3d 998, 1013 (N.D. Cal. 2025) (quoting *Rodriguez Diaz v. Garland*, 53 F.4th 1189, 1208 (9th Cir. 2022)). However, when the Government has previously decided to release a noncitizen and there is no evidence in the record of any changed circumstance that might have caused the Government to reconsider its initial decision, courts have found the Government's interest in re-detention is low. *Doe*

*v. Chestnut*, No. 1:25-cv-01372- CDB (HC), 2025 WL 3295154, at *10 (E.D. Cal. Nov. 26, 2025) (citations omitted).

Defendants' interest is even lower now than when this Court granted Plaintiffs' motion for a TRO. As discussed above, the Ninth Circuit's recent decision in *Rodriguez Vazquez*, 183 F.4th 1160, established that Plaintiffs' detention is not "expressly mandated by statute."[15] Finally, the fiscal and administrative burdens that the additional procedural requirement would entail are also in Plaintiffs' favor. The "minimal" effort and cost required to provide Plaintiffs with hearings, *see Doe v. Becerra*, 787 F. Supp. 3d 1083, 1094 (E.D. Cal. 2025), pales in comparison to the "staggering" costs to the public of immigration detention. *See Hernandez*, 872 F.3d at 996. Therefore, Plaintiffs have shown a likelihood of success on their Procedural Due Process claim.

**B. Plaintiffs will likely suffer irreparable harm absent a stay.**

Plaintiffs have shown that they will likely suffer irreparable harm absent a stay. First, the Court finds that class members' re-detention is likely while Defendants' new arbitrary Re-Detention Policy remains in place. *See Garro Pinchi*, 813 F. Supp. 3d at 1036. Such "[d]eprivation of physical liberty by detention constitutes irreparable harm." *Arevalo v. Hennessy*, 882 F.3d 763, 767 (9th Cir. 2018). Second, "[i]t is well established that the deprivation of constitutional rights unquestionably constitutes irreparable injury," *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012), including in the immigration detention context. *Hernandez v. Sessions*, 872 F.3d 976, 994–95 (9th Cir. 2017). Therefore, "[w]hen an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." *Warsoldier v. Woodford*, 418 F.3d 989, 1001–02 (9th Cir. 2005). Here, re-detaining class members likely violates

[15] (*Contra* Defs.' Opp'n 21.) Even if Plaintiffs' detention were statutorily mandated, Defendants' "asserted compliance with the statutes does not demonstrate they have satisfied the requirements of the Due Process Clause, 'which of course constitute[s] the supreme law of the land[.]'" (Order Granting Pet'rs' Ex Parte Mot. TRO 8 (alteration in original) (quoting *Tot v. United States*, 319 U.S. 463, 472 (1943) (Black, J., concurring)).)

their Procedural Due Process rights. *See Garro Pinchi*, 813 F. Supp. 3d at 1036. This provides another basis on which to find that irreparable harm is likely absent a stay. *See id.*

Defendants argue that re-detention is too speculative. But they have not disavowed any intention to re-detain class members. Quite the opposite; they insist that re-detaining class members like Mr. Fanfan is statutorily *mandated*. (*See* Oral Arg. Tr. 19:16–20:21 (expressing Government's continuing belief that class members like Mr. Fanfan are subject to mandatory detention under § 1225(b)(2)).) Defendants assert that the fact that "Plaintiffs have not deemed it necessary to seek an extension of the Court's temporary restraining order or file a motion for preliminary injunction" shows that there is no real re-detention threat. (Defs.' Opp'n 22.) Not so. The Court has repeatedly held that the named plaintiffs face a real and immediate risk of re-detention (like the rest of the class).[16] Further, Defendants' arguments are at odds with one another. Defendants suggest that, if Plaintiffs truly fear re-detention, they should seek injunctive relief. Yet Defendants have thrice told the Court that § 1252(f)(1) would bar such injunctive relief. (Defs.' Mot. Dismiss 20; Defs.' Opp'n Pls.' Mot. Provisional Class Certification 5–9, ECF No. 24; Defs.' Opp'n 9.) Defendants cannot have it both ways.

**C. The balance of the equities and the public interest favor granting relief.**

Defendants' showing on the balance of the equities and the public interest is weak. Defendants' argument that this prong favors them is largely predicated on their erroneous interpretation of § 1225(b)(2). After *Rodriguez Vazquez*, it is untrue that "Defendants will suffer prejudice if the Court stays the implementation of the plain statutory language requiring detention of non-admitted noncitizens." (*See* Defs.' Opp'n 24.) *See generally* 183 F.4th 1160. Beyond that, Defendants assert generally that "[t]he Government has a

---

[16] *See supra* n.5. For the same reason, the Court denies Defendants' request to stay adjudication pending their appeal of *Garro Pinchi*, as it is likely untrue that "no concrete harm would result" from the Court staying adjudication. (*See* Defs.' Opp'n 25 n.5.)

compelling interest in the steady enforcement of its immigration laws." (*See* Defs.' Opp'n 24.) They argue that this is particularly true "after the election of a new President and the declaration of a national emergency at the southern border of the United States." (*Id.*) Defendants cite no case law for this proposition, and in any event, they refer to an election and proclamation that are now almost two years old. (*See id.*) Therefore, these factors do not bolster the Government's interest here.

"[T]he mere existence of the Executive Branch's desire to enact a policy is not sufficient to show that a stay would prejudice the government." *Garro Pinchi*, 813 F. Supp. 3d at 1037 (citation modified). "[C]ourts must be wary of the serious, perhaps irreparable, consequences that may flow from interference with the Executive's ability to implement immigration policy as it sees fit." *Id.* "But alleged injuries to the Executive's immigration agenda that are articulated 'in general terms' without 'concrete evidence' of prejudice to the government amount to only a 'weak' showing of governmental harm." *Id.* (quoting *Immigrant Defs. L. Ctr. v. Noem*, 145 F.4th 972, 985, 994 (9th Cir. 2025), *overruled on other grounds by Arizona All. for Retired Americans v. Mayes*, 186 F.4th 622 (9th Cir. 2026) (en banc)). Yet such general, conclusory allegations of prejudice are all that Defendants have provided here. Further, the Government's interest is diminished by the fact that Defendants' Re-Detention Policy likely violates Procedural Due Process and the APA, as the Government "cannot suffer harm" from preliminary relief "that merely ends an unlawful practice." *Id.* (quoting *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013)).

Conversely, Plaintiffs have made a strong showing that the public interest and balance of the equities favor granting relief. The public interest is served by APA compliance, *California v. Azar*, 911 F.3d 558, 581 (9th Cir. 2018), and Plaintiffs have shown that Defendants' new Re-Detention Policy likely violates the APA. Further, "it is always in the public interest to prevent the violation of a party's constitutional rights." *Baird v. Bonta*, 81 F.4th 1036, 1042 (9th Cir. 2023), and Plaintiffs have also shown that Defendants' new Re-Detention Policy likely violates their Procedural Due Process rights.

Therefore, Plaintiffs have shown that the balance of the equities and the public interest weigh in their favor.

## IV.

## CONCLUSION AND ORDER

As Plaintiffs have shown that all the preliminary relief factors are in their favor, the Court grants their motion for an interim stay. The Court accordingly postpones the effective date of Defendants' new arbitrary Re-Detention Policy as applied to class members[17] until entry of a final judgment in this action. During the postponement, Defendants' prior practice governs, under which they did not re-detain class members without first making an individualized determination that material changed circumstances related to flight risk or danger warranted re-detention.

**IT IS SO ORDERED.**

Dated: November 24, 2026

Hon. Dana M. Sabraw
United States District Judge

---

[17] *See Immigrant Defs. L. Ctr. v. Noem*, 145 F.4th 972, 996 (9th Cir. 2025), *overruled on other grounds by Arizona All. for Retired Americans v. Mayes*, 186 F.4th 622 (9th Cir. 2026) (en banc) (limiting scope of interim stay to current and future ImmDef clients).